UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

REBEKAH BUETENMILLER,
SAMANTHA BILLS, and
STACEY GLASS,

                    Plaintiffs,                    Case Number 20-11031
v.                                        Honorable David M. Lawson

MACOMB COUNTY, STEVEN
COGSWELL, WILLIAM HORAN,
CORRECT CARE SOLUTIONS, LLC,
WELLPATH, LLC, and JOHN DOES,

                    Defendants.

_____/

## OPINION AND ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT AND DISMISSING AS MOOT MOTIONS TO EXCLUDE EXPERT WITNESSES

The plaintiffs allege in a complaint that while they were inmates at the Macomb County Jail, they all were sexually assaulted by a prison doctor, Dr. Steven Cogswell, during routine medical examinations. They have brought suit against the County, the doctor (who is technically in default), a correctional officer who worked in the medical unit, and the company to which the County outsourced its medical care for jail inmates. They allege various legal theories, including the denial of constitutional rights under 42 U.S.C. § 1983. All defendants except Dr. Cogswell have filed motions for summary judgment. Because Cogswell's conduct cannot be attributable to any of the other defendants, and because the plaintiffs have not produced evidence demonstrating that those defendants violated their rights under any of their pleaded legal theories, the Court will grant the motions for summary judgment. The defendants also filed motions to bar the testimony of the plaintiffs' expert witnesses. Those motions will be denied as moot.

## I.  Facts and Proceedings

Rebekah Buetenmiller, Samantha Bills, and Stacey Glass were inmates at the Macomb County Jail in August and September 2018.  Each visited the jail's medical unit during that time to be seen by Dr. Steven Cogswell, the jail's new medical director.  Cogswell was hired and employed by Wellpath, the jail's health care services provider, and began working at the jail in August 2018.  (Wellpath was then "Correct Care Solutions," but has since changed its name.).  Cogswell was suspended by Wellpath on September 17, 2018, the day after the assaults were first reported to Wellpath and Macomb County, and eventually fired and prosecuted.

The jail's medical unit is a busy place.  It is oriented around a hallway, which nurses, doctors, inmates, and security officers regularly traverse.  The unit contains a number of examination rooms and offices, which open onto the hallway.  The exam rooms have metal doors, but they are not used; rather, medical staff pulled privacy screens across the entrance of exam rooms during sensitive appointments.  Cogswell saw patients in exam room three, which is next to both the nurses' office and the duty station, where the clinic deputy works, and behind the row of chairs where certain inmates wait to see medical staff.  The clinic deputy in 2018 was William Horan, a Macomb County Sheriff's Office employee charged with securing the medical unit and facilitating inmate appointments.  From his duty station, Horan would be able to hear and potentially see anything happening in Cogswell's exam room.

### A.  The Assaults

#### 1.  Rebekah Buetenmiller

Rebekah Buetenmiller began serving a sentence in the Macomb County Jail for "financial fraud," third degree home invasion, and larceny in a building.  She was convicted of these crimes in March and July 2018 and released later that year, sometime after September.

On September 14, 2018, she asked to see a doctor for stomach pain.  Cogswell examined Buetenmiller, seating her first by his desk, then moving her to the examination table.  Buetenmiller laid down on her back while Cogswell pushed on her stomach.  After moving down her torso, Buetenmiller put his hands under her pants and groped her genitals.  He also kissed her twice on the mouth.  Cogswell wrote an order for Motrin 800 and a double sleeping mat and scheduled her for future appointments.

At some point during the encounter, Cogswell pulled the privacy screen across the door of the examination room.  No one else entered the examination room and Buetenmiller did not scream out.  After the visit, security video footage shows Cogswell leave the examination room, give Buetenmiller a pill, walk over to Horan's station, and bend over to say something to Horan.  The appointment lasted sixteen minutes in total.

Buetenmiller did not immediately report the assault.  A day or two later, however, she wrote a note to inmate Amy Fried describing the visit.  She also wrote a complaint to a correction officer on September 16, 2018.  The untitled complaint states that Cogswell lowered his pants and boxers while assaulting her.  A detective interviewed Buetenmiller the next day.

### 2. Samantha Bills

Samantha Bills was incarcerated in the Macomb County Jail in August and September 2018 for a probation violation for possession of heroin.  On August 14, 2018, she was called down to the medical unit to see Dr. Cogswell for the first time.  She was upset because the call interrupted her shower, she felt ill because she was detoxing from heroin, and she did not know why she was being called down.  Cogswell began the exam by placing a stethoscope on her back.  He then pretended accidentally to drop the stethoscope down the front of her uniform and pinched her breast.  When she froze and did not react, Cogswell proceeded to reach under her pants and

- 3 -

digitally penetrated her vagina.  Although the door to Cogswell's office remained open, the privacy screen was pulled across it, and no one else came into the room.  Bills did not call out or protest, but asked Cogswell, "Same time next week?"  She stated that she joked with Cogswell out of nervousness and because she believed she had no choice but to be assaulted by him.  She also asked him to bring her tobacco products or Vicodin during future appointments.  The encounter lasted nineteen minutes in total.

On August 20, 2018, Cogswell scheduled Bills for another appointment.  He gave her chewing tobacco and she does not remember whether he inappropriately touched her.  Again, she remained alone with Cogswell during the entire visit, which lasted for twenty-two minutes.  On the sick-call list for that day, Deputy Horan wrote "Doc" next to Bills's name; he did not make similar notations next to any other inmates' names.

Cogswell also called Bills down to the medical unit on August 27 and September 10, 2018.  During the third visit, Cogswell gave Bills a bag of M&Ms instead of tobacco products and told her that she was becoming "an expensive date."  He groped her genitals.  No one else entered the room during the appointment, which lasted twelve minutes.  During the fourth and final visit, Cogswell asked to take nude pictures of Bills, directing her to lift up her shirt and pull down her pants.  He told her that he was owed the pictures in exchange for the tobacco and M&Ms and that he would look at the pictures at home that night.  Bills touched Cogswell's penis and Cogswell digitally penetrated her vagina.  The appointment lasted eleven minutes.  Security footage shows Horan in the unit hallway while Bills was in the exam room with Cogswell.  At one point, Horan is seen standing outside the exam room with his back to the door.

Bills never told Wellpath or jail officials about her interactions with Cogswell.  She stated, however, that Horan seemed to have Cogswell's back because Horan frequently walked by his

exam room and, she alleges, once nodded his head at Cogswell through the crack in the privacy screen.  After her second or third visit to Cogswell, Bills eventually told other inmates about the assaults, including her cellmate, plaintiff Rebekah Buetenmiller, and inmate Gina Roselli.

### 3.  Stacey Glass

In August and September 2018, Stacey Glass was a pretrial detainee in the Macomb County Jail.  On September 13, 2018, she was called down to the medical unit to see Cogswell.  Cogswell told her she was there because of a medication he thought she was taking.  She told him that she had sciatica and he felt her back.  Cogswell then reached around and put his hand into Glass's pants and groped her genitals.  Glass quickly closed her legs.  The encounter lasted fourteen minutes in total.

Later the same day, Glass called her mother to tell her about the incident.  She also told corrections deputy Christina Wancket a few days later, on September 16, 2018.  Wancket asked Glass to provide a statement, which she did in the form of an untitled, handwritten complaint. Glass quickly was contacted by a detective and other corrections officers regarding her complaint.

### B.  Official Response

Both Wellpath and the Macomb County Jail learned about the allegations against Cogswell on Sunday, September 16, 2018, after Glass and Buetenmiller submitted their written complaints. Jail Captain Walter Zimmy contacted Macomb County Jail Health Service Administrator Lara Ianitelli that same day to notify her of the complaint.  Ianitelli contacted Wellpath's human resources department, which told her that Cogswell needed to be removed from the jail.  Captain Zimmy also contacted the sheriff, who launched a criminal investigation.  When Cogswell came into work on Monday, September 17, 2018, he was immediately sent home.  Cogswell remained suspended until his termination in October 2018.

Cogswell was charged criminally and went to trial in January 2020.  All three plaintiffs testified.  Cogswell was found guilty on one count of second-degree criminal sexual conduct and sentenced to twelve months in prison and five years' probation.

### C. Wellpath's and Macomb County's Policies

Wellpath provides health care services at the Macomb County Jail through a contract with Macomb County.  The contract requires that Wellpath abide by all applicable laws, rules, and regulations, and "all administrative and security policies adopted by the County to protect the health, safety and welfare of the inmates."  Wellpath Cont., ECF No. 46-2, PageID.658.  Those policies include general orders issued by the Macomb County Sheriff's Office.  General Order 5.45 specifically requires the jail's health provider to ensure compliance with all administrative rules; local, state, and federal laws; and its Health Services Agreement with the county.  Gen. Orders, ECF No. 46-17, PageID.1051.  Other general orders require jail staff to "refrain from any inappropriate touching, gestures, or any inappropriate behavior toward inmates," *id.* at PageID.1015; to "conduct themselves at all times . . . in such a manner as to reflect favorably on the Sheriff's Office," *ibid.*; to ensure that the victims of sexual assault receive prompt medical care, including within the jail, *id.* at PageID.1017-18; to "ensure the safety and welfare" of all inmates including through "preventative patrol (rounds) to detect and/or prevent . . . sexual assaults," *id.* at PageID.1033; and to "ensure the protection of inmates' civil and legal rights," so that inmates are not "subjected to personal abuse, corporal punishment, personal injury, disease, property damage, or harassment," *id.* at PagID.1037.  However, consistent with Michigan's administrative rules for jails and lockups, Mich. Admin. R. 791.728, ECF No. 46-3, PageID.672, Wellpath retains sole discretion over inmates' medical care, Wellpath Cont., ECF No. 46-2, PageID.662.  Its contract specifies that "the County will not restrict or otherwise interfere with the

activities or judgment of the health care staff, in matters which involve the practice of medicine or provision of health care services." *Ibid.*

Wellpath also imposes its own policies and standards to ensure inmate safety and welfare. Wellpath's Team Member Manual prohibits fraternization, which it defines as "sexual misconduct or undue familiarity with a patient/offender," as well as "[a]ny act of harassment, sexual, racial or other directed to an individual," including "making sexual advances." Manual, ECF No. 44-2, PageID.403, 406-07. Additionally, the manual directs employees to ensure that all electronic communications "are of a professional nature," noting that "[v]iolations of this policy will result in disciplinary action up to and including termination of employment." *Id.* at PageID.410. All new hires receive a copy of the manual and sign an acknowledgement that they have read and understood it before their start date. Additionally, new hires, including Cogswell, received access to dozens of training modules reinforcing the policies in the manual. The modules, which employees must complete on a rolling basis, include two trainings on preventing sexual harassment and one on the Prison Rape Elimination Act.

Cogswell acknowledged that he had read and understood Wellpath's policies. He also received a binder of materials from Wellpath on his first day on the job. But Wellpath did not require him to complete any training modules before starting work, and his supervisor, Lara Ianitelli, did not receive the automated notice that Cogwell had failed to complete them until the day he was suspended.

Both the Macomb County Jail and Wellpath provide information to inmates regarding their rights and how to protect them. The jail provides every inmate with a guide stating its Prison Rape Elimination Act policy and noting that it has "a zero-tolerance standard for any incident of sexual assault." Inmate Guide, ECF No. 58-14, PageID.1726. The guide "encourage[s] prisoners to

identify and report any potential threats or misconducts." *Ibid.* The jail also displays posters throughout the facility reiterating this information. The guide includes the jail's grievance procedure, which states that grievances must be clearly titled "GRIEVANCE," include all pertinent information, be filed within ten days of the incident, and be submitted either to an office or to the letterbox. The procedure also specifies that grievances may be directed to medical staff.

The defendants maintain that both jail staff and Wellpath medical personnel verbally communicate to inmates that they should let officials know if they feel uncomfortable. Wellpath also had a privacy-of-care policy in 2018 that allowed female inmates to request a chaperone for appointments with male health care providers. However, the policy did not *require* chaperones, and Deputy Horan acknowledged that he noticed that Cogswell was not using them. On a few occasions, he reported to Wellpath staff his concern that Cogswell was alone with female patients behind a privacy screen. Once, upon a request from Horan, nursing director Monica Cueny "popped in" to Cogswell's exam room during an appointment and determined that nothing was wrong. Horan also told Wellpath paramedic Kim Decrescenzio "a couple of times" that Cogswell was using the screen, but she did not think it suspicious because other doctors also used the screen and had the discretion to do so.

Wellpath reviewed applicants' background information, but it is unclear to what extent Wellpath investigated Cogswell before hiring him. Cogswell did not know whether Wellpath performed a background check on him and his supervisor, Lara Ianitelli, did not testify that she reviewed any background check information or interviewed Cogswell. Cogswell did state, however, that before he applied to Wellpath he had never been denied privileges, lost his license, been sued, lost a job, or had criminal charges filed against him. Neither the jail nor Wellpath received any complaints about Cogswell before September 16, 2018.

## D. Procedural History

The three plaintiffs filed their complaint on April 27, 2020 and amended it on August 8, 2020.  The amended complaint alleges a number of constitutional, tort, contract, and state-law statutory claims against Dr. Cogswell, Deputy Horan, Wellpath, and Macomb County.  Wellpath, Horan, and Macomb County moved for summary judgment on May 28, 2021.  In their responses to the defendants' motions for summary judgment, the plaintiffs agreed to dismiss all of their tort and contract claims, as well as certain state-law claims against various defendants, but later they reversed course as to their tort claims.  The live claims presently in the case are as follows:

- Count 1:  excessive force against Horan (Section 1983 – Eighth Amendment);

- Count 2:  failure to protect against Horan (Section 1983 – Eighth Amendment);

- Count 3:  violation of the substantive due process right to bodily integrity against Horan (Section 1983 – Fourteenth Amendment);

- Count 4:  violation of the right to equal protection against Horan (Section 1983 – Fourteenth Amendment);

- Count 5:  negligence and gross negligence against Wellpath;

- Count 6:  sex-based harassment against Horan, Macomb County, and Wellpath (Elliot-Larsen Civil Rights Act);

- Count 7:  denial of full enjoyment of public accommodation against Horan, Macomb County, and Wellpath (Elliot-Larsen Civil Rights Act);

- Count 8:  assault against Wellpath;

- Count 9:  battery against Wellpath;

- Count 10:  invasion of privacy against Wellpath;

- Count 11:  intentional infliction of emotional distress against Wellpath;

- Count 12:  failure to report abuse against Horan (Michigan Social Welfare Act);

- Count 14:  municipal liability against Macomb County and Wellpath (Section 1983 – failure to train and supervise).

Am. Compl., ECF No. 17, PageID.146-65.

Defendant Cogswell has not answered the complaint or the amended complaint.

The Wellpath defendants and the County defendants each move for summary judgment. Although they raise a number of arguments addressing the plaintiffs' several theories of liability, the thrust of their motion arguments is that they cannot be held legally responsible for Cogswell's misconduct. They say that *respondeat superior* is not available to render them vicariously liable for the federal claims, and they cannot be deliberately indifferent to the plaintiffs' welfare because they had no knowledge that Cogswell was doing what he did, and they acted promptly to remove him when they found out. And although *respondeat superior* is a viable avenue for the plaintiffs to prove liability under certain state law claims, the defendants insist that the doctrine is no help to the plaintiffs because Cogswell was not acting within the scope of his employment when he committed the assaults.

The plaintiffs respond that they can overcome these arguments with proof that the defendants knew — or should have known — of Cogswell's conduct shortly after it occurred, or even while it was occurring. They point to bits of circumstantial evidence, such as Cogswell's failure to view the training modules. But they mostly rely on evidence suggesting that Deputy Horan was on the scene at the time of the assaults, he expressed suspicion or concern over Cogswell's examination practices, and he comported himself as if to be covering for Cogswell. These arguments rise and fall on the answer to a recurring question in imputed liability litigation: what did Horan know and when did he know it? More precisely, how does the evidence in this record answer these questions?

## II.  Summary Judgment Motions

As the parties well know, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A trial is required when "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

The party bringing the motion first must explain why the record is so settled that no genuine issues of material fact exist by "identify[ing] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627-28 (6th Cir. 2018) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).  To rebut that showing, "[t]he nonmoving party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 628 (quoting *Anderson.*, 477 U.S. at 250.  The opposing party must base that rebuttal on specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.  Notably, however, "[t]he court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009) (quoting *Anderson*, 477 U.S. at 251-52).

A.  Federal Claims

1.  Macomb County and William Horan

The plaintiffs each allege various claims against defendant Horan under the Eighth and Fourteenth Amendments via 42 U.S.C. § 1983: excessive force, failure to protect (Eighth Amendment); violation of bodily integrity, denial of equal protection (Fourteenth Amendment). Horan interposes defenses of qualified immunity and the failure to exhaust the jail's grievance procedures, which the Prison Litigation Reform Act requires.  But he mainly argues that the plaintiffs' Eighth Amendment claims must fail because the plaintiffs cannot show that he acted with deliberate indifference to a substantial risk of serious harm.  There is no evidence, he says, that Cogswell posed — or Horan perceived that Cogswell posed — a substantial risk before the assaults occurred.  Similarly, he argues that the plaintiffs' Fourteenth Amendment claims must fail because there is no evidence that Horan was aware of, encouraged, condoned, or approved of conduct that violated the plaintiffs' bodily integrity or had any reason to believe they were at a substantial risk of being abused because of their sex.

To state a claim under section 1983, a plaintiff must allege that (1) she was deprived of a right, privilege, or immunity secured by the federal Constitution or laws of the United States; and (2) the deprivation was caused by a person acting under color of state law.  *Flagg Bros. v. Brooks*, 436 U.S. 149, 155-57 (1978); *Harris v. Circleville*, 583 F.3d 356, 364 (6th Cir. 2009); *Brock v. McWherter*, 94 F.3d 242, 244 (6th Cir. 1996).  Additionally, a plaintiff must allege that the deprivation of her rights was intentional.  *Davidson v. Cannon*, 474 U.S. 344, 348 (1986); *Daniels v. Williams*, 474 U.S. 327, 333-36 (1986).

a. Eighth Amendment Claims

The Eighth Amendment, as made applicable to states via the Fourteenth Amendment, prohibits the infliction of "cruel and unusual punishments" against prisoners. U.S. Const. amend. VIII; *United States v. Georgia*, 546 U.S. 151, 157 (2006). Federal courts have interpreted the amendment to prohibit "any punishment that violates civilized standards of decency or reflects unnecessary and wanton infliction of pain." *Solomon v. Michigan Dep't of Corr.*, 478 F. App'x 318, 320 (6th Cir. 2012) (citing *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976)).

To sustain a claim under the Eighth Amendment for a prison official's failure to provide protection from conduct that violates civilized standards of decency, the plaintiffs must show that Horan was deliberately indifferent to "a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). The applicable test has two elements. *Id*. at 834. First, the plaintiffs must demonstrate that the constitutional deprivation was "objectively, 'sufficiently serious.'" *Ibid*. (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). Second, they must demonstrate that Horan had a "sufficiently culpable state of mind." *Ibid*. This element can be proven by circumstantial evidence from which the fact finder can conclude that the state actor perceived the risk, *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001), or "from the very fact that the risk was obvious," *Terrance v. Northville Reg'l Psychiatric Hospital*, 286 F.3d 834, 843 (6th Cir. 2002).

In Count 1 of the amended complaint, the plaintiffs allege that Horan violated the Eighth Amendment by subjecting them to "excessive force." As a side note, Stacey Glass was a pretrial detainee, and her claim therefore must be addressed under the Fourteenth Amendment, discussed below. And neither Buetenmiller nor Bills alleges that Horan exerted any force against them. Instead, their claims are that he exhibited deliberate indifference to the substantial risk of harm created by sexual harassment and assault. That is the same allegation they make in their Eighth

Amendment failure to protect claim in Count 2.  However, it is not a proper basis for proving use

of excessive force.  *Farmer*, 511 U.S. at 835 (quoting *Hudson v. McMillian*, 503 U.S. 1, 6 (1992)

("application of the deliberate indifference standard is inappropriate" when "officials stand

accused of using excessive physical force.").  Rather, excessive force requires a showing that force

was used maliciously and sadistically to cause harm.  *Hudson v. McMillian*, 503 U.S. 1, 7 (1992).

There is no dispute that Horan did not exert force in this case.  Horan is entitled to summary

judgment on Count 1.

Beutenmiller and Bills have offered sufficient evidence on the first part of their deliberate

indifference claim in Count 2.  Sexual assault objectively constitutes a serious constitutional

deprivation under the Eighth Amendment.  *Rafferty v. Trumbull Cnty.*, 915 F.3d 1087, 1095 (6th

Cir. 2019).  And while "'isolated, brief, and not severe' instances of sexual harassment do not give

rise to Eighth Amendment violations," no party alleges that the assaults the plaintiffs suffered were

anything but severe.  *Ibid.* (citing *Jackson v. Madery*, 158 F. App'x 656, 662 (6th Cir. 2005),

*abrogated on other grounds by Maben v. Thelen*, 887 F.3d 252 (6th Cir. 2018)).  Cogswell groped

the plaintiffs beneath their clothing during encounters that lasted several minutes or more.  *See*

Horan dep., ECF No. 46-6, PageID.774 (summarizing lengths of plaintiffs' visits to Cogswell).

He assaulted Bills repeatedly over the course of a month, groped her genitals and breasts, and took

nude pictures of her on his personal cellphone.  Bills dep., ECF No. 46-7, PageID.818, 843-44,

854-57.  He exposed himself to Buetenmiller while groping her genitals.  Buetenmiller Compl.,

ECF No. 44-11, PageID.506; Buetenmiller dep., ECF No. 46-14, PageID.965.  These assaults

unquestionably rise to the level of "objectively, sufficiently serious" harm necessary to support an

Eighth Amendment claim.  *See Farmer*, 511 U.S. at 828, 834 (1994); *Rafferty*, 915 F.3d at 1095

(collecting cases).

However, neither plaintiff has brought forth facts sufficient to support an inference that Horan deliberately ignored the risk of harm. *Farmer*, 511 U.S. at 843.

### i. Buetenmiller

There is no evidence that Horan "subjectively perceived facts from which to infer substantial risk to [Buetenmiller], that he did in fact draw the inference, and that he then disregarded that risk." *Perez v. Oakland Cnty.*, 466 F.3d 416, 424 (6th Cir. 2006) (quoting *Comstock*, 273 F.3d at 703). Horan testified that he did not learn about any alleged harassment until September 17, 2018, when he heard about Cogswell's suspension. Horan dep., ECF No. 46-6, PageID.767. He said that he had no knowledge or suspicion of any wrongdoing by Cogswell before that date, and that Cogswell never told him he assaulted Buetenmiller. *Id.* at PageID.755-60, 763-64. Although he worked in proximity to Cogswell and monitored his exam room, Horan never heard anything suspicious, never saw patients leaving Cogswell's exam room crying or upset, and never received any reports from patients about any inappropriate conduct. *Id.* at PageID.740-42, 748, 767, 771-73. Horan said that he had no reason to believe that doctor visits presented a substantial or obvious risk of sexual assault to any inmate. This direct evidence is unrebutted.

The plaintiffs argue that Horan must have perceived the risk to Buetenmiller, because Horan was concerned that Cogswell was at times alone with female patients behind the privacy screen. But Horan did not believe that deploying the screen, which was widely used by medical staff, indicated sexual assault. Moreover, it is undisputed that Horan reported Cogswell's use of the screen to Wellpath, whose policies governed whether the screen should be used and whether patients could request chaperones. Horan reasonably could do no more than that: under Wellpath's contract, correctional officers could not interfere with the practice of medicine, and Horan's

supervisors interpreted that provision to mean that officers should not interject in the use of the privacy screen.

The plaintiffs also argue that Horan's conduct in surveillance videos demonstrates that he knew of and aided in Cogswell's assaults. The footage does not support that proposition. It merely shows Horan walking around the medical unit, sitting at his desk, standing near Cogswell's examination room, and listening to Cogswell. Surveillance Videos, ECF No. 56-10, at 2:25:10-2:40:00; ECF No. 56-11, at 8:41:00-8:59:00. Nothing about these everyday activities suggests that Horan knew of or abetted the assault.

The plaintiffs have not produced evidence that would allow a factfinder to infer that Horan had any knowledge at the time of Cogswell's conduct, or even that he should have suspected that Cogswell posed any danger to his inmates/patients. There is no evidence in this record that Horan perceived any risk or that the risk was obvious. Horan is entitled to summary judgment against Buetenmiller on Count 2 of her complaint.

ii. Bills

The same reasoning applies to Bills's claim in Count 2. Bills adds the facts that Horan once nodded to Cogswell through the crack in the privacy screen, walked by Cogswell's exam room frequently, and once stood with his back near the door to Cogwell's exam room during one of the visits when she was assaulted. But none of these activities creates a fact question on whether Horan subjectively knew that Bills was in any danger of being assaulted. Nor do they demonstrate that the substantial risk of sexual assault was so obvious that Horan must have known about it. *See Farmer*, 511 U.S. at 842. There is no evidence that sexual assault at the Macomb County Jail was so "longstanding, pervasive, well-documented, or expressly noted by prison officials in the

past" that Horan must have known about it. *Ibid.* The record in fact suggests the opposite: Wellpath suspended Cogswell as soon as it learned of the allegations against him.

Horan is entitled to summary judgment against Bills on Count 2 of her complaint.

### b. Fourteenth Amendment Claims

All three plaintiffs plead claims under a substantive due process theory. However, only Glass, in her status as a pretrial detainee, can rely on that theory. Buetenmiller and Bills have recourse to the "explicit textual source of constitutional protection" offered by the Eighth Amendment, and a more general claim of substantive due process therefore is not available to them. *Graham v. Connor*, 490 U.S. 386, 395 (1989); *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998).

Glass, as a pretrial detainee, may proceed under the Fourteenth Amendment, which grants her rights that are "at least as great as the Eighth Amendment protections available to a convicted prisoner." *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983); *Whitley v. Albers*, 475 U.S. 312, 327 (1986). Also, for pretrial detainees, the deliberate indifference test is substantially modified. The first part of the test dispenses with any subjective analysis of the officer's perceptions. The Sixth Circuit explained that "*Kingsley v. Hendrickson*, 576 U.S. 389 (2015), eliminates the subjective element of a pretrial detainee's deliberate-indifference claim." *Brawner v. Scott Cty., Tennessee*, 14 F.4th 585, 591 (6th Cir. 2021). Now, "the appropriate standard is objective." *Id.* at 592. And "the second prong of the deliberate indifference test applied to pretrial detainees . . . require[s] only recklessness," that is, "'more than negligence but less than subjective intent — something akin to reckless disregard.'" *Greene v. Crawford Cty., Michigan*, No. 20-1715, 2022 WL 34785, at *8 (6th Cir. Jan. 4, 2022) (quoting *Brawner*, 14 F.4th at 597).

Even under this more generous standard, however, Glass's proofs are wanting.  Glass does not allege that Horan engaged in any conduct particular to her.  Like her co-plaintiffs, Glass was subject to a serious constitutional deprivation, but she cannot demonstrate that Horan "acted "deliberately (not accidentally), [and] also recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known."  *Ibid.* (quoting *Brawner*, 14 F.4th at 597.

Horan is entitled to summary judgment on Glass's substantive due process claim.

The plaintiffs also allege that Horan's conduct denied them equal protection of the laws because of their sex.  But those claims solely rest on Horan's alleged failure to prevent Cogswell from sexually abusing them.  However, as explained above, Horan did not know that Cogswell was sexually abusing inmates.  Nor have the plaintiffs made the threshold showing that they were treated differently from other similarly situated inmates.  *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985) (explaining that the Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike [by the State]."") (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)).  A claim of sex discrimination under the equal protection clause requires a finding that state actors engaged in gender-based discrimination.  *J.E.B. v. Alabama*, 511 U.S. 127, 130-31 (1994); *Canterino v. Wilson*, 869 F.2d 948, 954 (6th Cir. 1989) (citing *Geduldig v. Aiello*, 417 U.S. 484, 494 (1974)).  "Absent a threshold showing that [they are] similarly situated to those who allegedly receive favorable treatment, the plaintiff[s] do[] not have a viable equal protection claim."  *Klinger v. Dep't of Corr.*, 31 F.3d 727, 731 (8th Cir. 1994) (citing *Samaad v. City of Dallas*, 940 F.2d 925, 941 (5th Cir. 1991)).  The plaintiffs have not identified or produced evidence of similarly-situated male inmates who received favorable treatment due to their gender.  *Klinger*, 31 F.3d at 732-33.  More is needed to demonstrate intentional discrimination

than allegations that are "vague and conclusory and unsupported by the facts." *Canterino*, 869 F.2d at 954. Horan is entitled to summary judgment on the plaintiffs' equal protection claims.

c. Municipal Liability Claim

The plaintiffs allege in Count 14 of their amended complaint that Macomb County violated their constitutional rights be failing to train and supervise the jail medical staff. The County argues that it had no duty to train and monitor Cogswell, whom it did not employ.

Local governmental entities like Macomb County cannot be held liable under 42 U.S.C. § 1983 solely for the acts of their agents; they are accountable under that statute only for their own conduct. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978) (holding that "a municipality cannot be held liable [under section 1983] solely because it employs a tortfeasor — or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory"). The plaintiffs, therefore, must point to an official policy, custom, or practice of that local government as the source of the constitutional violation. *Johnson v. Karnes*, 398 F.3d 868, 877 (6th Cir. 2005). And they must allege facts that show a causal connection between the policy and the injury. *Board of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997); *Heyerman v. Cnty. of Calhoun*, 680 F.3d 642, 648 (6th Cir. 2012).

A plaintiff can establish *Monell* liability against a county by showing that "the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). To plead such a claim, the plaintiff must allege facts that demonstrate either (1) "a pattern of similar constitutional violations by untrained employees and [the defendant's] continued adherence to an approach that it knows or should know has failed to prevent tortious conduct by employees, thus establishing the conscious disregard for the consequences of its action . . . necessary to trigger municipal liability," or (2) "a

single violation of federal rights, accompanied by a showing that [the defendant] has failed to train its employees to handle recurring situations presenting an obvious potential for a constitutional violation." *Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 738-39 (6th Cir. 2015) (citations, quotations, and alterations omitted). "[P]rivate parties that perform fundamentally public functions, or who jointly participate with a state to engage in concerted activity," also may be held liable under *Monell* because they "are regarded as acting 'under the color of state law' for purposes of § 1983." *Harrison v. Ash*, 539 F.3d 510, 521 (6th Cir. 2008) (quoting *Bartell v. Lohiser*, 215 F.3d 550, 556 (6th Cir. 2000)).

There is no proof in this record that the County was involved in any way in Cogswell's training, or that it ought to have been. Macomb County lacked the right to control Cogswell or dictate his training and was in fact barred in its contract with Wellpath from doing so. The small number of prior incidents of inappropriate contact between Macomb County employees and inmates does not establish that the County labored under a "pattern" of sexual assaults. *Mize v. Tedford*, 375 F. App'x 497, 501 (6th Cir. 2010) (finding for purposes of *Monell* liability that police officers did not engage in a pattern of assaults where "no more than a handful of sexual-assault allegations" were made over two decades). Of the approximately five such incidents reported over the prior decade, none involved Wellpath. Rape was not an obvious consequence of any failure by Macomb County to train its contractors. *Doe v. Magoffin Cnty. Fiscal Ct.*, 174 F. App'x 962, 970 (2006); *see also Campbell v. Washtenaw Cnty.*, No. 17-cv-12639, 2019 WL 3003637, at *10 (E.D. Mich. July 10, 2019) (finding that sexual assault by jail doctor was not an obvious consequence of the county's failure to train).

Macomb County had written policies barring sexual misconduct, and it advertised these policies as well as the protections offered by the Prison Rape Elimination Act. Although the

County perhaps could have provided more and better training to its contractors, the plaintiffs have not shown that its failure to do so caused their sexual assault.

Macomb County is entitled to summary judgment on the *Monell* claim in Count 14 of the amended complaint.

### 2. Wellpath

The plaintiffs alleged a *Monell* claim as their sole federal cause of action against Wellpath. Wellpath likewise is entitled to summary judgment on that claim.   The plaintiffs have not demonstrated that Wellpath failed to train its employees or that such a failure amounted to deliberate indifference of their rights. *City of Canton*, 489 U.S. at 388.   There are no fact questions remaining as to whether Wellpath ignored "a pattern of similar constitutional violations by untrained employees." *Shadrick,* 805 F.3d at 738.   Because Wellpath personnel had never before been accused of inappropriate contact with inmates at the Macomb County Jail, Wellpath had no reason to know that its training policies "failed to prevent tortious conduct by employees." *Id.* at 739.   It certainly did not ignore the assaults in the present case: the company immediately investigated the allegations against Cogswell and suspended him the day after it learned of the assaults.   Nor does this case fall within the "'narrow range of circumstances [where] a pattern of similar violations might not be necessary to show deliberate indifference' in the failure-to-train context." *Siler v. Webber,* 443 F. App'x 50, 55 (6th Cir. 2011) (quoting *Connick v. Thompson*, 563 U.S. 51, 63 (2011)).   Rape is an "intentional, violent act" that fell "far outside the scope" of Cogswell's duties and therefore "cannot be something that was 'obvious' to occur." *Magoffin Cnty. Fiscal Ct.*, 174 F. App'x at 970 (finding that a county was not liable under *Monell* where it was not plainly obvious that an employee would commit rape); *Mize*, 375 F. App'x at 501 (same).

In determining whether Wellpath is liable for "not taking reasonable steps to train its employees . . ., the focus must be on adequacy of the training program in relation to the tasks the particular [employees] must perform." *City of Canton*, 489 U.S. at 390. "That a particular [employee] may be unsatisfactorily trained will not alone suffice to fasten liability on the [employer], for the [employee's] shortcomings may have resulted from factors other than a faulty training program." *Id.* at 390-91. An "otherwise sound program" may have been negligently administered, for example, or an adequately trained employee nevertheless may make a mistake. *Ibid.* "Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct." *Ibid.* Rather, plaintiffs must show that "the deficiency in training actually caused" their ultimate injury, so that "the injury [could] have been avoided had the employee been trained under a program that was not deficient in the identified respect." *Id.* at 391.

No reasonable jury could find from the evidence in this record that Wellpath's training policies were deficient or caused the plaintiffs' injuries in this case. Wellpath had a written policy barring sexual misconduct, provided Cogswell with the policy, and required Cogwell to acknowledge it before he began working at the Macomb County Jail. The existence and provision of the written policy undercuts the plaintiffs' argument that Wellpath completely failed to train employees not to commit sexual harassment or assault. *Mayo v. Macomb Cnty.*, 183 F.3d 554, 558 (6th Cir. 1999) (finding that a county's written arrest policy defeated the plaintiff's claim that the county's failure to adequately train officers caused her unconstitutional arrest).

Wellpath is entitled to summary judgment on the plaintiffs' *Monell* claims in Count 14 of the amended complaint.

B.  State Law Claims

1.  Elliot-Larsen Act Claims

In Counts 6 and 7 of the amended complaint, the plaintiffs allege that all the defendants violated their rights under Michigan's Elliott-Larsen Civil Rights Act.  That Act prohibits persons from "[d]eny[ing] an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service because of religion, race, color, national origin, age, sex, or marital status."  Mich. Comp. Laws § 37.2302(a).  Despite legislation suggesting otherwise, *see* Mich. Comp. Laws § 37.2301(b), Michigan courts have found that ELCRA applies to prisoners.  *Does 11-18 v. Dep't of Corr.*, 323 Mich. App. 479, 489, 917 N.W.2d 730, 736 (2018), *appeal denied*, 504 Mich. 883, 928 N.W.2d 214, 215 (Mich. 2019) (holding that the ELCRA amendment excluding prisoners violated the Michigan Constitution, Art. 1, § 2, which requires that legislation protecting civil rights be extended to all).

Under ELCRA, "[d]iscrimination because of sex includes sexual harassment," which the statute defines as "unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature."  Mich. Comp. Laws § 37.2103(i).  To prove "sexual harassment affecting public services," the plaintiffs must submit evidence "that [they were] subjected to any of the types of unwelcome sexual conduct or communication described in the statute."  *Hamed v. Wayne Cnty.*, 490 Mich. 1, 9-10, 803 N.W.2d 237, 243-44 (2011).  They must also show that they suffered either *quid pro quo* or hostile-environment harassment.  *Quid pro quo* sexual harassment means that "the public service provider or the public service provider's agent made submission to the proscribed conduct a term or condition of obtaining public services or used the plaintiff[s'] submission to or rejection of the proscribed

conduct as a factor in a decision affecting [their] receipt of public services." *Ibid*. Hostile-environment harassment requires proof that the unwelcome sexual conduct or communication had "the purpose or effect of substantially interfering with" their public services or created "an intimidating, hostile, or offensive . . . public services . . . environment." Mich. Comp. Laws § 37.2103(i)(iii); *see also Chambers v. Trettco, Inc.*, 463 Mich. 297, 311, 614 N.W.2d 910, 916 (2000) (applying the hostile environment harassment test in an employment context).

The plaintiffs' Elliott-Larsen claims are not clearly stated. The amended complaint makes duplicative claims for sexual harassment (Count 6) and denial of the full enjoyment of public accommodation (Count 7), and the plaintiffs' responses to the motions for summary judgment confusingly suggest that the defendants are liable not in their capacity as providers of public services but because they are employers. But the plaintiffs are not the defendants' employees, and the relevant question is not whether the defendants created a hostile work environment. Rather, the plaintiffs must demonstrate that the defendants created a hostile *public services* environment or conditioned their receipt of public services on their submission to unwanted sexual conduct. The plaintiffs have not made that showing, and no questions of material fact remain.

a. William Horan

First, as to defendant Horan, the plaintiffs have not demonstrated and do not allege that Horan engaged in any "verbal or physical conduct or communication of a sexual nature." Mich. Comp. Laws § 37.2103(i). Instead, they appear to argue that Horan is liable under a vicarious liability theory. But Horan did not employ or supervise anyone, and he cannot be held vicariously liable for his failure to report to his own superiors. The plaintiffs' claims against Horan therefore fail as a matter of law. *Hamed*, 490 Mich. at 10, 803 N.W.2d at 244.

b.  Macomb County

Because the plaintiffs are pursuing "a civil rights claim against [] principal[s]," under either theory of harassment they must demonstrate vicarious liability.  *Ibid.*  "[I]f a defendant is not vicariously liable for the acts of its agent under traditional principles of *respondeat superior*, the plaintiff's claim under the CRA fails as a matter of law."  *Ibid.*  So it is with the claims against the County.  The plaintiffs' failure to establish vicarious liability defeats those Elliot-Larsen claims.  They contend that Macomb County knew or should have known that the plaintiffs were sexually harassed because Horan, a Macomb County employee, knew or should have known the same.  Their argument ends there, without the required showing that Macomb County was vicariously liable for Cogswell's conduct.

The "traditional principles of *respondeat superior*" apply to vicarious liability under Michigan law, including the common-law principle that employers may be held responsible for harassment committed by their agents.  *Hamed*, 490 Mich. at 10, 20, 803 N.W.2d at 244, 249 (citing *Chambers*, 463 Mich. at 312, 614 N.W.2d at 916).  "In Michigan, the test for a principal-agent relationship is whether the principal has the right to control the agent."  *Little v. Howard Johnson Co.*, 183 Mich. App. 675, 680, 455 N.W.2d 390, 393 (1990) (citing *Avery v. American Honda Motor Car Co.,* 120 Mich. App. 222, 225, 327 N.W.2d 447 (1982), *lv. den.* 417 Mich. 1100.49 (1983)).

Macomb County lacked the right to control Cogswell and was barred in its contract with Wellpath from doing so.  The contract specified that Macomb County would "not restrict or otherwise interfere with the activities or judgment of health care staff," Cont., ECF No. 46-2, PageID.662, and county correctional officers testified that they conducted themselves accordingly.  That defeats the idea that there was "a practical identity" between Macomb County and Wellpath's

employees, so that Macomb County is "constructively present" in every one of Cogswell's acts. *Cox v. Bd. of Hosp. Managers for City of Flint*, 467 Mich. 1, 11, 651 N.W.2d 356, 361 (2002) (quoting *Smith v. Webster*, 23 Mich. 298, 299-300 (1871)).

Cogswell was not Macomb County's agent, Macomb County was not vicariously liable for Cogswell, and the plaintiffs' Elliott-Larsen claims against Macomb County also fail as a matter of law.

### c.  Wellpath

The plaintiffs' Elliott-Larsen claim against Wellpath presents a closer case.  Wellpath was Cogswell's employer, and "[a]n employer is generally liable for the torts its employees commit within the scope of their employment." *Hamed*, 490 Mich. at 10-11, 803 N.W.2d at 244.  However, Michigan courts have defined "within the scope of employment" to mean "engaged in the service of his master, or while about his master's business." *Ibid.* (quoting *Barnes v. Mitchell*, 341 Mich. 7, 13, 67 N.W.2d 208 (1954) (citations omitted)).  This definition excludes activities "intended solely to further the employee's individual interests," *ibid.* (citing 2 Restatement Agency, 3d, § 7.07, p. 201), including sexual assault, *id.* at 11, 244-45.

In cases like this, where the employee's harassing conduct amounts to a criminal act, "an employer can be held liable for its employee's conduct if 'the employer knew or should have known of [the] employee's propensities and criminal record' before that employee committed an intentional tort." *Ibid.* (quoting *McClements v. Ford Motor Co.*, 473 Mich. 373, 381, 702 N.W.2d 166 (2005) (citations omitted)).  "This inquiry involves an analysis of whether an employer had (1) actual or constructive knowledge of prior similar conduct and (2) actual or constructive knowledge of the employee's propensity to act in accordance with that conduct." *Ibid.*

Here, there is "no question" that Cogswell's sexual assault of the plaintiffs "was beyond the scope of his employment" as a doctor. *Ibid.* The sexual assaults were "independent action[s] accomplished solely in furtherance of [Cogswell]'s own criminal interests," and it "cannot be said that [Wellpath] benefited in any way from" them. *Ibid.*

The plaintiffs argue that Wellpath nevertheless knew or should have known about Cogswell's sexual harassment because Deputy Horan reported to a Wellpath nurse and paramedic that Cogwell was alone with female patients behind a privacy screen. But Michigan courts have required far more proof before that knowledge can be attributed to the employer. In *Brown v. Brown*, 478 Mich. 545, 554-555, 739 N.W.2d 313, 318 (2007), for example, the Michigan Supreme Court held that an employer was not vicariously liable for a rape committed by its employee, even though the employee repeatedly made sexually offensive comments to the plaintiff and the plaintiff reported the incidents to the employer. The court determined that the comments "did not clearly and unmistakably threaten particular criminal activity" where the employee had no prior criminal record and had never explicitly threatened to rape the plaintiff. *Ibid.* Similarly, in *Hamed*, 490 Mich. at 15-16, 803 N.W.2d at 247, the court found that Wayne County was not vicariously liable for a deputy sheriff's sexual assault of an inmate because, although it was aware that the deputy had a propensity to disobey work-related protocol and engage in aggressive behavior when provoked, it was not aware of whether he had engaged in any prior criminal sexual misconduct.

Horan's reports do not suggest that Cogswell was inclined toward sexual misconduct. The plaintiffs have presented no other facts demonstrating that Wellpath had "actual or constructive knowledge of prior similar criminal sexual misconduct" by Cogswell. *Id.* at 16, 248; *Sheridan v. Forest Hills Pub. Sch.*, 247 Mich. App. 611, 621, 637 N.W.2d 536, 542 (2001). No question of fact thus remains as to whether Wellpath created a hostile public services environment or

conditioned the plaintiffs' receipt of public services on their submission to unwanted sexual conduct.

Wellpath is entitled to summary judgment on Counts 6 and 7 of the amended complaint.

### 2.  Other Tort Claims

The plaintiff brought claims for negligence and gross negligence (Count 5), assault (Count 8), battery (Count 9), invasion of privacy (Count 10), and intentional infliction of emotional distress (Count 11).  For the same reason, the plaintiffs' other state law tort claims against Wellpath fail, as they are all predicated on its vicarious liability for Cogswell's conduct, except, perhaps, a negligence claim.  Read generously, the amended complaint alleges that Wellpath was negligent and grossly negligent for failing to follow the Michigan Public Health Code.

Wellpath argues that the facts do not support the plaintiffs' *respondeat superior* theory of liability, and also that the claims are barred by governmental immunity, which it contends extends to Wellpath as Macomb County's contracting agent.

The claim based on a violation of the Public Health Code fails because the statutory provisions that the plaintiffs cite in support of their argument deal exclusively with mental health treatment, which is not at issue here.  *See* Mich. Comp. Laws §§ 1708, 1722.  They also cite administrative rules that have been rescinded.  *See* Mich. Admin. Code R. 330.7045.  The plaintiffs do not otherwise explain what duty of care Wellpath owed to the plaintiffs, and their supplemental brief argues only that Wellpath cannot escape liability for actions Cogswell took on its behalf. Therefore, all five of the plaintiffs' tort claims are properly analyzed under the rubric of whether Wellpath was responsible for Cogswell's wrongful acts.

Because Wellpath cannot be held responsible for the intentional conduct of its employee that was committed outside the scope of his employment, and there is "no question" that

Cogswell's sexual assault of the plaintiffs "was beyond the scope of his employment" as a doctor, *Hamed*, 490 Mich. at 11-12, 803 N.W.2d at 244-45, the plaintiffs cannot succeed on their state tort claims unless they can produce some evidence allowing an inference that Wellpath knew or should have known of Cogswell's "propensities" before he committed the sexual assaults, *ibid.* They have not done so. The state law tort claims will be dismissed.

### 3. Michigan Social Welfare Act Claim

In Count 12 of the amended complaint, the plaintiffs allege that all the defendants violated the Michigan Social Welfare Act by failing to report Cogswell's abuse to the county department of social services. The plaintiffs have not pleaded or proved facts showing that this statute applies to them.

The Michigan Social Welfare Act (SWA) was enacted to "provide protection, welfare and services to aged persons, dependent children, the blind, and the permanently and totally disabled," as well as to "poor or unfortunate persons." 1990 Mich. Legis. Serv. 122 (West). Its protections extend to "vulnerable adult[s]," *In re Townsend Conservatorship*, 293 Mich. App. 182, 190, 809 N.W.2d 424, 429 (2011), and include the requirement that health care service providers and law enforcement officers make a report to a county social services department if they have a "reasonable cause to believe that an adult has been abused, neglected, or exploited," Mich. Comp. Laws § 400.11a.

For the purpose of this Act, an "adult" is defined as "a vulnerable person not less than 18 years of age who is suspected of being or believed to be abused, neglected, or exploited." *In re Townsend Conservatorship*, 293 Mich. App. at 190, 809 N.W.2d at 429 (quoting Mich. Comp. Laws § 400.11(b)). It defines "vulnerable" as "a condition in which an adult is unable to protect himself or herself from abuse, neglect, or exploitation because of a mental or physical impairment

or because of advanced age." *Ibid.* (quoting Mich. Comp. Laws § 400.11(f)).  An individual who is not aged and does "not have a mental or physical impairment" is not a "vulnerable adult" under the SWA.  *Id.* at 191, 809 N.W.2d at 429.

None of the plaintiffs allege that they possess any of the qualities that that would categorize them as an "adult" under the SWA.  The Act simply does not apply to them.  Moreover, the undisputed facts establish that the defendants took prompt and appropriate action as soon as Cogswell's misconduct was made known to them.

The defendants are entitled to summary judgment on Count 12 of the amended complaint.

### III.  Expert Witness Motions

The defendants also have moved to strike the reports of the plaintiffs' expert witnesses Dr. Gerald Shiener and Dr. Bradley Sewick and prevent them from testifying at trial.  They argue that their reports are untimely and incomplete, and they take issue with Dr. Shiener's qualifications to render certain opinions.

Because the amended complaint will be dismissed as to all defendants but Dr. Cogswell, the Court need not address these motions.

### IV.  Conclusion

The plaintiffs have alleged serious, criminal misconduct against Dr. Steven Cogswell, who assaulted them while they were Macomb County Jail inmates.  However, the plaintiffs have not produced evidence that any of the defendants had knowledge of Cogswell's conduct or his criminal tendencies at any time before the assaults took place.  The plaintiffs have not come forward with evidence necessary to create an issue of fact on all the elements of their various claims.  In addition to challenging the substance of each of the claims, the defendants have asserted defenses based on

failure to exhaust administrative remedies and various types of immunity.  The Court need not address those arguments because the plaintiffs' claims fail on the merits.

Accordingly, it is **ORDERED** that the defendants' motions for summary judgment (ECF No. 44, 46) are **GRANTED**.

It is further **ORDERED** that the amended complaint is **DISMISSED WITH PREJUDICE** as to all defendants **except** Steven Cogswell.

It is further **ORDERED** that **on or before January 27, 2022**, the plaintiffs must either ask the Clerk to enter the default of defendant Steven Cogswell and thereafter take appropriate action to seek judgment against him, or move to voluntarily dismiss the complaint against him under Federal Rule of Civil Procedure 41(a)(2).

It is further **ORDERED** that the motions to exclude expert witnesses (ECF No. 45, 48, 63) are **DISMISSED as moot**.

It is further **ORDERED** that defendant William Horan's motion *in limine* (ECF No. 91) is **DISMISSED as moot**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   January 20, 2022