UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

REBEKAH BUETENMILLER,
SAMANTHA BILLS, and
STACEY GLASS,

          Plaintiffs,                          Case Number 20-11031

v.                                           Honorable David M. Lawson

STEVEN COGSWELL,

          Defendant.
_____/

**OPINION AND ORDER GRANTING MOTION FOR DEFAULT JUDGMENT**

Plaintiffs Rebekah Buetenmiller, Samantha Bills, and Stacey Glass filed the present action against several entities and individuals alleging that while they were inmates at the Macomb County Jail in August and September 2018, they were sexually assaulted by defendant Steven Cogswell, the jail's new medical director. The Court granted summary judgment in favor of all the defendants except Cogswell, who did not answer or otherwise respond to the complaint. The plaintiffs thereafter moved for a default judgement against him, and the Court held a hearing to determine damages. Defendant Cogswell appeared and participated in the hearing. His liability is established by the allegations in the complaint, which are taken as true as a result of his default. The Court will award damages in the various amounts set forth below based on the evidence presented.

I.

The facts of this case were discussed at length in the Court's prior summary judgment opinion. *See Buetenmiller v. Macomb Cnty.*, No. 20-11031, 2022 WL 203000 (E.D. Mich. Jan. 20, 2022). For the purpose of the present motion, the focus will be turned on the allegations against defendant Cogswell.

Plaintiffs Rebekah Buetenmiller, Samantha Bills, and Stacey Glass were inmates at the Macomb County Jail in August and September 2018. Each visited the jail's medical unit during that time to be seen by defendant Steven Cogswell, the jail's new medical director. Cogswell was hired and employed by Wellpath, the jail's health care services provider, and began working at the jail in August 2018. Cogswell was suspended by Wellpath on September 17, 2018, the day after the assaults were first reported to Wellpath and Macomb County, and eventually fired and prosecuted.

All three plaintiffs alleged in their amended complaint that they reported to the medical unit at the Macomb County Jail asking for medical attention. While there, Cogswell, who was employed by Wellpath, LLC, the jail's health care services provider (known at the time as "Correct Care Solutions"), sexually assaulted each of them, in ways described in more detail below. The plaintiffs sued Macomb County, Cogswell, a correctional officer who worked in the medical unit, and Wellpath. They filed a twelve-count complaint alleging federal claims under 42 U.S.C. § 1983 and various state law theories. The complaint later was amended.

The amended complaint requests compensatory and consequential damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering; economic damages; and punitive damages in amounts to be determined at trial. Cogswell never answered the complaint or otherwise appeared in the case to defend against the claims.

Wellpath, the corrections officer, and Macomb County moved for summary judgment. The Court granted their motions and dismissed the amended complaint with prejudice as to all defendants *except* Cogswell. *Buetenmiller v. Macomb Cnty.*, No. 20-11031, 2022 WL 203000, *15 (E.D. Mich. Jan. 20, 2022). The Court then ordered the plaintiffs either to ask the Clerk of Court to enter the default of Cogswell and thereafter take appropriate action to seek judgement, or

move voluntarily to dismiss the complaint against him. Accordingly, the plaintiffs requested a Clerk's Entry of Default, and a default as to Cogswell was filed on January 21, 2022. After a procedural misstep, the plaintiffs filed the pending motion for default judgment and asked for a hearing to determine damages. The hearing was held on June 28, 2022.

Each of the plaintiffs made separate allegations against Cogswell and testified at the hearing about the effect of his assault on their wellbeing. They also offered the testimony of witnesses in support of their damages claims.

### Rebekah Buetenmiller

Rebekah Buetenmiller alleged that she began serving a sentence in the Macomb County Jail for "financial fraud," third-degree home invasion, and larceny in a building. On September 14, 2018, she asked to see a doctor for stomach pain. Cogswell examined Buetenmiller, seating her first by his desk, then moving her to the examination table. Buetenmiller laid down on her back while Cogswell pushed on her stomach. After moving down her torso, Buetenmiller put his hands under her pants and groped her genitals. He also kissed her twice on the mouth. Cogswell wrote an order for Motrin 800 and a double sleeping mat and scheduled her for future appointments.

At some point during the encounter, Cogswell pulled the privacy screen across the door of the examination room. No one else entered the examination room and Buetenmiller did not scream out. The appointment lasted sixteen minutes in total.

At the evidentiary hearing, Buetenmiller testified that she was an outgoing, bubbly person before she was assaulted by Cogswell. She said that in social settings, she "lit up the room." She was athletic, having played softball in college, and played classical piano. After the assault, Buetenmiller felt violated and outraged. She remained incarcerated for another month or two, a

period that was much more traumatic for her. She refused lock downs because she feared being trapped, and she had an episode that resulted in her being sent to the mental health unit. She then was placed in a different unit but remained isolated.

When she was released from jail, Buetenmiller first turned to drugs, which she used for one day. However, she quickly pivoted to recovery. She got into a recovery house, where she stayed for 18 months, completed counseling, sought addiction treatment, and worked to repair her relationship with her family and girlfriend. Nevertheless, Buetenmiller says that she continues to feel the physical and emotional effects of her trauma. She has trouble sleeping and is on blood pressure medication that treats her PTSD; she cannot sleep without it. She also is pregnant, with a planned pregnancy that now is high-risk; however, she is afraid to go to the obstetrician and is avoiding her prenatal appointments. She went to only one visit, where she "melted down" in a panic attack.

Buetenmiller says that she is afraid to go out, especially to public places where she sees people who look like Cogswell. She also is afraid to return to the Macomb County Jail, where she is serving weekends for a sentence for an old criminal charge. She refuses to go to the medical unit while in jail.

Buetenmiller presently is employed at a factory. On cross-examination by Cogswell (representing himself), Buetenmiller acknowledged that she testified during the criminal trial that, while meeting with Cogswell, she used a code word for receiving sexual favors.

Jaclynn Szymanski, Rebekah Buetenmiller's partner, testified that she has known Buetenmiller her whole life. She described Buetenmiller as being outgoing and having good energy, and a personality Szymanski fell in love with. However, after the assault, Szymanski said

Buetenmiller's personality changed; she is closed off, has no self-confidence, does not want to go out, and has no motivation. They no longer are intimate.

Szymanski also testified that Buetenmiller has trouble sleeping and wakes up screaming. Buetenmiller's eating habits have changed, so that she eats nothing for days, then binges. She confirmed that Buetenmiller refuses to go to her prenatal appointments. Szymanski is not aware that Buetenmiller ever attempted suicide before the assault.

Linda Hobert is the mother of Buetenmiller's partner, Jaclynn Szymanski. She has known Buetenmiller for many years because she was a lunch mom at Buetenmiller's elementary school. She testified that she and Buetenmiller now are very close.

Hobert testified that before the assault, Buetenmiller was happy-go-lucky; she got along with everyone. But her personality changed afterward. Hobert testified that Buetenmiller seems very depressed and unhappy. She does not want to go anywhere, including family functions, or to get the proper care for her or her baby now that she is pregnant. Hobert opined that the old Rebekah would absolutely have gone to her prenatal appointments.

Hobert testified that the assault impacted Buetenmiller's relationship with her daughter. They have feuded and are not as close as they used to be.

The plaintiff also presented a report from Dr. Gerald Shiener, a psychiatrist, who examined her in September 2020. He wrote that Buetenmiller's past medical history included an injury in an automobile accident and a hospitalization for suicidal ideation. She acknowledged a significant history of drug abuse. Nonetheless, Dr. Shiener wrote that Buetenmiller denied any prior trauma or "boundary issues." Her behavior was unremarkable except when she discussed the assault. He diagnosed her with post-traumatic stress disorder, which he ascribes to the assault, although he

acknowledged that "this woman has had other stressors in her life." Because Buetenmiller remained symptomatic after 18 months, Dr. Shiener believed that her prognosis was "poor."

Samantha Bills

Samantha Bills alleged in the amended complaint that she was incarcerated in the Macomb County Jail in August and September 2018 for a probation violation for possession of heroin. On August 14, 2018, she was called down to the medical unit to see Cogswell for the first time. She was upset because the call interrupted her shower, she felt ill because she was detoxing from heroin, and she did not know why she was being called down. Cogswell began the exam by placing a stethoscope on her back. He then pretended accidentally to drop the stethoscope down the front of her uniform and pinched her breast. When she froze and did not react, Cogswell proceeded to reach under her pants and digitally penetrated her vagina. Although the door to Cogswell's office remained open, the privacy screen was pulled across it, and no one else came into the room. Bills did not call out or protest, but asked Cogswell, "Same time next week?" She stated that she joked with Cogswell out of nervousness and because she believed she had no choice but to be assaulted by him. She also asked him to bring her tobacco products or Vicodin during future appointments. The encounter lasted nineteen minutes in total.

On August 20, 2018, Cogswell scheduled Bills for another appointment. He gave her chewing tobacco and she does not remember whether he inappropriately touched her. Again, she remained alone with Cogswell during the entire visit, which lasted for twenty-two minutes.

Cogswell also called Bills down to the medical unit on August 27 and September 10, 2018. During the third visit, Cogswell gave Bills a bag of M&Ms instead of tobacco products and told her that she was becoming "an expensive date." He groped her genitals. No one else entered the room during the appointment, which lasted twelve minutes. During the fourth and final visit,

Cogswell asked to take nude pictures of Bills, directing her to lift up her shirt and pull down her pants. He told her that he was owed the pictures in exchange for the tobacco and M&Ms and that he would look at the pictures at home that night. Bills touched Cogswell's penis and Cogswell digitally penetrated her vagina. The appointment lasted eleven minutes.

At the hearing, Bills testified that she was a happy and outgoing person before she was assaulted by Cogswell. She enjoyed hiking and being outside and was a scuba driver. She was happily married. After she first was assaulted by Cogswell, Bills felt confused and upset. She contemplated committing suicide. After the second visit, she felt even worse, with very low self-worth. She refused to leave her cell, which she often did before, or to talk to or go near anyone.

Bills first told plaintiff Rebekah Buetenmiller about the assault. She later told her husband, who left her because of the assault. She was in love with her husband and did not want the marriage to end. She also told her mother and sister.

Bills said that after she was released from jail, she retreated into herself. She stays away from everyone. She does not answer the phone. She does not trust anyone, and avoids her family and friends, with whom she previously was close. As a result, Bills was homeless when she first was released. Her mother is worried sick that she will find Bills dead.

Bills became addicted to drugs before her encounter in the Macomb County Jail. She became so addicted and ill that her mother found her in the attic of a trap house, near dead. She was fully septic and had double pneumonia, and almost was put into a medical coma. She is still dealing with the medical impacts of her trauma-related drug use and was given two years to live if she does not have further procedures, including open heart surgery to install a pacemaker and synthetic valve.

Bills is in very poor health. She says that she has not gotten the lifesaving procedures she needs because she was completely traumatized by Cogswell's assault and is afraid of doctors. She does not want to be put under anesthesia because she is afraid that people will do bad things to her while she is unconscious. Her heart is not working properly, resulting in fluid accumulation in her lungs. She has trouble sleeping but also has symptoms similar to narcolepsy due to her medical conditions.

Bills is scheduled to have a cardiac echo test done soon as preparation for the necessary heart surgery, which could then take place within a couple of weeks. However, she worries that she will continue to avoid receiving this care. Bills also is scheduled to begin seeing a therapist. She has twice been in counseling since her release; however, she quit because the therapists were male and she is afraid of them.

Bills lives with a friend. She is so afraid to sleep that she only sleeps in cars, in the driveways of friends or family.

Kelly Ann Bills, the plaintiff's mother, testified that Samantha was close to her family and very happy and outgoing before she was assaulted by Cogswell. Now, she no longer comes to family gatherings, does not see her family often, and stays to herself, which is a significant change in behavior.

Kelly said that Samantha felt humiliated and violated, especially after the criminal trial against Cogswell. Kelly also said that Samantha's drug use was much worse after she was released from jail, and that as a result she has health issues that she did not have before. She describes Samantha as very depressed and suffering from low self-esteem. She says Samantha has given up on everything.

Before she was incarcerated, Samantha worked for her parents at their adult foster care and construction businesses.

Harry Golenberke is Samantha Bills's longtime friend and current roommate. He has known Samantha since they were teens. They were close friends. He said that she was always a pleasure to be around and was the life of the party.

Golenberke testified that Samantha changed after she was incarcerated. He saw her in 2019 and could tell that she was on a lot of drugs. He barely recognized her. Golenberke says that Bills is now very distant. She "hides," and has no motivation. She does not cook, clean, or shop, and only eats when he makes her food. Her hygiene is not the best.

On cross-examination by Cogswell, Golenberke testified that he is not aware that Bills previously made other sexual assault allegations.

Dr. Shiener also examined Samantha Bills. The consultation took place on November 10, 2020. Dr. Shiener reported that Bills had been employed as a cashier, a waitress, and an exotic dancer at a gentlemen's club and had a history of heroin abuse. After her multiple encounters with Cogswell, Bills said that she became depressed. She suffered panic attacks and relapsed into drug abuse when her brother came home from prison. She reported a history of childhood sexual abuse, but she was able to maintain relationships with men as an adult. She described sleep disturbances, troubling dreams, and flashbacks to her childhood traumas during intimacy with her boyfriend. Dr. Shiener diagnosed Bills with post-traumatic stress disorder and depression. He wrote that she had "a very difficult time with an abusive, drug addicted, violent father and had been molested as a child and young adult." Dr. Shiener described Bills's initial reaction to Cogswell's first sexual touching "was 'how can I work this,'" suggesting some manipulative motivation on her part. Nonetheless, he opined that the encounter with Cogswell "triggered a full blown" PTSD, but he

did not explain how the effects of Bills's past history could be separated from the trauma inflicted by Cogswell.

Stacey Glass

According to the amended complaint, in August and September 2018, Stacey Glass was a pretrial detainee in the Macomb County Jail. On September 13, 2018, she was called down to the medical unit to see Cogswell. Cogswell told her she was there because of a medication he thought she was taking. She told him that she had sciatica and he felt her back. Cogswell then reached around and put his hand into Glass's pants and groped her genitals. Glass quickly closed her legs. The encounter lasted fourteen minutes in total.

At the hearing, Glass described herself as outgoing and bubbly before she was assaulted by Cogswell. She testified that she liked going out and doing things, was planning on going to college, and was hopeful for the future. After the assault, Glass stated that she was in shock and felt like trash. She called home immediately. She also made a written statement, which led to her being interviewed by jail officials, and, within 48 hours, investigating detectives.

As part of the investigation, Glass was evaluated by doctors, which she found to be very stressful. She felt an overwhelming sense of her safety being threatened. Later, she spoke to a therapist from Turning Point while she was still incarcerated at the Macomb County Jail.

Glass testified that when she came home, she felt trapped in her own mind and afraid to do basic things. She is terrified of being out in public, unable to run errands or even go to the grocery store. She feels like people are staring at her and are going to attack her. She is embarrassed by her fear and inability to care for her family.

Glass does not want to go to doctor's appointments. She has a seven-month-old son, who was born with a tongue tie that required surgery. The operating ear, nose, and throat doctor was a man, and Glass felt unsafe during the appointment.

Glass is afraid to engage with male doctors or friends. Her relationship with her husband also is affected. She feels bad that she is burdening him with errands and her stress. When she returned home from prison, a male family friend was staying with her family, and she was afraid to live there.

Glass's health also has been affected. She has headaches and crying spells, and her weight fluctuates. She often is unable to sleep, especially for the weeks around court dates. The only thing that helps is retreating into herself, and she feels isolated.

Glass sees one of two therapists every other week. Insurance covers part of the cost, which she believes to be about $80 to $100 per session. She intends to continue therapy for the foreseeable future.

Ronald Mouton, II, Glass's husband, testified that they first met in 2015 and dated until 2016, when they lost touch. They reconnected while Glass was incarcerated and talked every day. He did not notice an immediate change in Glass's demeanor after the assault, however, because they often spoke only briefly.

When Mouton first met Glass, she was outgoing and friendly. He described her as the life of the party. But when she returned from prison, he noticed that she had changed significantly. She is afraid to go out by herself and is cagey and anxious. He described Glass as being psychologically impaired by everyday tasks, and she cries and worries a lot more. This has affected their relationship, causing stress and leading to arguments. They go on fewer dates.

Mouton testified that Glass has a child from a previous relationship who does not live with them. Mouton is a warehouse attendant for Ford. He works 70 hours per week. When he comes home from work, he is tired and does not want to have to run the errands Glass is afraid to do.

Again, Dr. Shiener furnished a report of a consultation with Stacey Glass, whom he examined on October 5, 2020. He reported that Glass was an inmate at the Macomb County Jail awaiting trial on a charge of killing her abusive boyfriend; she eventually was convicted of manslaughter and transferred to another institution to complete her sentence. She told Dr. Shiener that Cogswell's assault potentiated her feelings of vulnerability because she believed that she was protected in the jail institution but instead became victimized. Glass was molested as a child, and Cogswell's sexual touching "brought it all back." She had "troubling dreams" that recalled her childhood abuse and the encounter at the jail. Her stress manifested itself physically with fluctuating weight gain and loss and gastrointestinal symptoms. Dr. Shiener diagnosed Glass with post-traumatic stress disorder and depression. He described her as "a woman with a troubled past," but he attributed his diagnosis to the assault by Cogswell. Because symptoms persisted for over two years, Dr. Shiener believed that the prognosis was poor.

Cogswell did not offer any witnesses or other evidence at the hearing.

## II.

The plaintiffs ask the Court to enter judgment against Cogswell and award each of them $5,000,000, for a total judgment of $15,000,000. They did not ask for those damages in their pleadings. Under those circumstances, Federal Rule of Civil Procedure 55(b)(2) "allows but does not require the district court to conduct an evidentiary hearing" to assess damages upon a motion for entry of judgment by default. *Vesligaj v. Peterson*, 331 F. App'x 351, 354 (6th Cir. 2009). "[T]he court must ensure that there is a basis for the damages specified in a default judgment[;] it

may, but need not, make the determination through a hearing." *Fustok v. ContiCommodity Servs., Inc.*, 873 F.2d 38, 40 (2d Cir. 1989). The Court may, in lieu of a hearing, "rely on detailed affidavits or documentary evidence . . . to evaluate the proposed sum." *Ibid.*

"[W]hen § 1983 plaintiffs seek damages for violations of constitutional rights, the level of damages is ordinarily determined according to principles derived from the common law of torts." *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 306 (1986) (citations omitted). "To that end, compensatory damages may include not only out-of-pocket loss and other monetary harms, but also such injuries as 'impairment of reputation . . . , personal humiliation, and mental anguish and suffering." *Id.* at 307 (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350 (1974)). Courts also may award punitive damages under section 1983 when a defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally-protected rights of others. *Smith v. Wade*, 461 U.S. 30, 56 (1983). Punitive damages are subject to a court determination of appropriateness under the Due Process Clause, based on (1) "the degree of reprehensibility" of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded and "the civil penalties authorized or imposed in comparable cases." *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 568, 575 (1996).

Under Michigan law, plaintiffs may recover damages for past and future economic and non-economic losses, including emotional and mental distress damages. *Philips v. Butterball Farms Co.*, 448 Mich. 239, 251-52 & n.32, 531 N.W.2d 144, 149 (1995)). Plaintiffs asserting claims of sexual assault likewise may recover exemplary damages for "humiliation, sense of outrage, and indignity," *Kewin v. Massachusetts Mut. Life Ins. Co.*, 409 Mich. 401, 295 N.W.2d

50, 55 (1980), but only if the award does not redress the same harm addressed by compensatory damages, *Veselenak v. Smith*, 414 Mich. 567, 572, 327 N.W.2d 261, 263 (1982)

All of the prerequisites for default judgment have been met. Cogswell has been served properly and has failed to appear or otherwise respond to the amended complaint. The plaintiffs also have obtained a clerk's entry of default.

Because the plaintiffs' damages are unliquidated, "a default admits only defendant's liability and the amount of damages must be proved." *Antoine v. Atlas Turner, Inc.*, 66 F.3d 105, 110 (6th Cir. 1995) (quoting *Fehlhaber v. Fehlhaber*, 681 F.2d 1015, 1026 (5th Cir. 1982) (en banc), *cert. denied*, 464 U.S. 818 (1983)). The Court must consider the record evidence in recommending a damages award. As part of that inquiry, the Court properly may consider awards made in other similar cases, which serve as useful guideposts. *See Mize v. Tedford*, 375 F. App'x 497, 500 (6th Cir. 2010) (upholding a damages award that, among other things, was "roughly in the middle of the range of the other verdicts" the district court examined).

Citing two out-of-circuit district court cases, the plaintiffs contend that an award of $5 million in damages per plaintiff is in line with what other courts have awarded in similar situations. *See Rode v. Credio*, No. 14-02354, 2016 WL 5109866, at *1 (D. Ariz. Sept. 20, 2016) (entering default judgment of $10 million for a prison *employee* who was violently assaulted by an inmate), *adopting report and recommendation*, 2016 WL 5339682 (D. Ariz. Aug. 3, 2016); *Doe v. United States*, No. 17-01991, 2018 WL 2431774, at *10 (D. Ariz. May 30, 2018) (entering default judgment of $3.75 million to a prison inmate who was sexually assaulted over several months by a prison guard).

Courts within this circuit, however, have awarded more modest, yet still sizeable, damages awards to individuals whose stories more closely reflect the plaintiffs' ordeals in this case. Examples include:

- A $1.5 million default judgment to a prisoner who was beaten and raped three times by a fellow inmate. *Wilcox v. Kalchert*, No. 20-00234, 2022 WL 1138079, at *7 (W.D. Mich. Mar. 14, 2022), *report and recommendation adopted*, 2022 WL 1137054 (W.D. Mich. Apr. 18, 2022).

- A $1 million default judgment to a prisoner who was sexually assaulted by another inmate and gave birth as a result of the assault. *Morgan by next Friend Campbell v. Wayne Cnty.*, No. 17-12094, 2021 WL 1220870, at *3 (E.D. Mich. Apr. 1, 2021) (Cleland, J.).

- A $250,000 default judgment where a probationer was sexually harassed by and forced to perform oral sex on her probation officer. *McPeters v. Thomas*, No. 3:18-39, 2021 WL 1033240, at *7 (E.D. Tenn. Feb. 24, 2021), *report and recommendation adopted*, 2021 WL 1030981 (E.D. Tenn. Mar. 17, 2021), *aff'd sub nom. McPeters v. Parker*, No. 21-5401, 2022 WL 1440652 (6th Cir. May 6, 2022).

- A $2,613,672 default judgment to an individually who twice was sexually assaulted and subsequently was sexually harassed by an undercover police officer. *Pecsi v. Cross*, No. 14-00220, 2016 WL 3456454, at *2 (W.D. Mich. June 2, 2016), *report and recommendation adopted*, 2016 WL 3405871 (W.D. Mich. June 21, 2016).

- A $350,000 default judgment to an individual who was sexually assaulted by a police officer after a traffic stop. *Mize v. Tedford*, No. 08-10660, 2009 WL 1508375, at *3 (E.D. Mich. May 29, 2009) (Cleland, J.), *aff'd*, 375 F. App'x 497 (6th Cir. 2010).

- A $2 million default judgment for pain and suffering where a prisoner repeatedly was sexually harassed and assaulted by a psychiatrist over the course of two years. *Langton v. Combalecer*, No. 06-11987, 2008 WL 11504510, at *2 (E.D. Mich. July 11, 2008) (Hood, J.).

Courts in other circuits also have collected similar cases. *See, e.g.*, *Mathie v. Fries*, 121 F.3d 808, 814 (2d Cir. 1997) (collecting cases awarding $80,000 to $650,000 to individuals who were assaulted by police officers); *Doe v. Whitebread*, No. 15-1165, 2017 WL 590272, at *4 (M.D. Pa. Feb. 14, 2017) ("Based on a review of cases involving officers assaulting members of the community or arrestees, which the court finds comparable to the plaintiff's case, the range of

awards for emotional damages begins at $25,000.00 and in one case reached $750,000.00"); *Trinidad v. City of Bos.*, No. 07-11679, 2011 WL 915338, at *6 (D. Mass. Mar. 15, 2011) ("Courts awarding compensatory damages for — usually multi-incident — sexual assault and rape of inmates or detainees by prison guards and corrections officers have ranged from $100,000 to $500,000.").

In calculating compensatory damages in analogous sexual assault cases, courts consider a number of elements. Medical treatments are compensable, including the cost of therapy and medications, or other treatments for post-traumatic stress disorder. *See Langton*, 2008 WL 11504510, at *2. None of the plaintiffs offered any evidence of the cost of medical or psychological care, except Stacey Glass, who testified that she sees a therapist at a charge of $80 to $100 per session, which is covered by insurance.

Lost income based on plaintiffs' remaining life expectancy also is compensable if plaintiffs lose the ability to perform a job or pursue educational opportunities due to trauma. *See Pecsi*, 2016 WL 3456454, at *2; *Langton*, 2008 WL 11504510, at *2. None of the plaintiffs offered any evidence on this element of damages.

The negative impact of sexual assault on plaintiffs' relationships, family, behavior, and general wellbeing may be considered, including the effects of addiction, lost relationships with children and parents, sleeplessness, depression, anxiety, and low self-esteem. *See Mathie*, 121 F.3d at 813; *McPeters*, 2021 WL 1033240, at *5; *Mize*, 2009 WL 1508375, at *3. Courts compare plaintiffs' behavior before and after the assault to evaluate the extent to which the incident sent the plaintiffs down a troubling path. *See McPeters*, 2021 WL 1033240, at *6 ("From 2012 to 2017, Plaintiff maintained a job, was drug free, and maintained good relationships with her family, including her children. After the incident, Plaintiff lost her job, she relapsed, she lost her house,

and her relationships with her family became strained and later non-existent."); *Mize*, 2009 WL 1508375, at *3 ("In addition to the emotional effect, Plaintiff has experienced weight gain and has increased her alcohol and tobacco use."). Exemplary damages also may be awarded under Michigan law for outrage or indignity; however, any such award may not result in double recovery for emotional injury. *Wilcox*, 2022 WL 1138079, at *7 (citing *Veselenak*, 414 Mich. at 572, 327 N.W. 2d at 263).

In considering evidence of emotional distress, courts evaluate plaintiffs' credibility, for example by weighing their facial expressions, tone of voice, and manner alongside any medical records supporting their testimony. *See McPeters*, 2021 WL 1033240, at *5. The humiliation, embarrassment, and other emotional damage suffered can be immense and have lasting effects, even as a result of a single incident of sexual assault. *See Morgan*, 2021 WL 1220870, at *3 (citing *Proof of Damages for Sexual Assault*, 15 Am. Jur. Proof of Facts 3d 259 § 3 Overcoming Societal Myths About Victims (Nov. 2019 supp.)). However, courts have reasoned that larger awards are warranted in cases involving repeated sexual assaults, or where the victims are children. *See Wilcox*, 2022 WL 1138079, at *7; *Morgan*, 2021 WL 1220870, at *3; *McPeters*, 2021 WL 1033240, at *6. Notably, only Bills alleges that Cogswell assaulted her more than once, and the evidence presented by the parties at summary judgment suggests that Bills is the least credible of the three plaintiffs. According to Dr. Shiener, Bills initially viewed Cogswell's misconduct as an opportunity for her own gain.

Nonetheless, the plaintiffs all have testified credibly that Cogswell's assaults had a profound psychological and emotional effect on them. Rebekah Buetenmiller described her fear of encounters with male health care providers, even to the point of jeopardizing her pregnancy. The psychological aftermath of the assault has damaged her relationship with her partner and has

affected her personality when measured against her pre-assault behavior. Samantha Bills testified that Cogswell's assault destroyed her marriage, severely aggravated her preexisting drug addiction, jeopardized her health by rendering her afraid to seek much needed medical care from male doctors, and made her homeless. Stacey Glass and her husband described the marked change in her personality following the assault. She is afraid to go out, she cannot run routine errands, and she is engaged in long-term psychological therapy. The trauma of the assault has adversely affected her marriage. All of the plaintiffs have been diagnosed by Dr. Shiener with post-traumatic stress disorder with a poor prognosis.

In many ways, these three plaintiffs are similarly situated and have described the aftermath of the assault in similar ways. Samantha Bills described multiple assaults, and her ensuing drug problems are severe. But it is not clear that her current condition is entirely attributable to the conduct of defendant Cogswell. Rebekah Buetenmiller and Stacey Glass also had other stressors in their life, which no doubt contribute to their continuing psychological difficulty.

All of the plaintiffs described the profound effect that Cogswell's sexual misconduct had on them, particularly because it occurred in an institutional setting that deprived them of the control and autonomy that unincarcerated individuals enjoy. They are entitled to a significant compensatory award, but not in the amount they demand. Instead, fair compensation approximates the cases of other victims of single-incident assaults by authority figures, such as police and probation officers, summarized earlier. The Court, therefore, will award compensatory damages to the three plaintiffs in the amount of $550,000 each.

The plaintiffs also ask for an award of punitive damages against defendant Cogswell. "Punitive damages are appropriate in a § 1983 action 'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the

federally protected rights of others.'" *King v. Zamiara*, 788 F.3d 207, 216 (6th Cir. 2015) (quoting *Smith v. Wade,* 461 U.S. 30, 56 (1983). "The allowance of such damages involves an evaluation of the nature of the conduct in question, the wisdom of some form of pecuniary punishment, and the advisability of a deterrent." *Wesley v. Campbell*, 864 F.3d 433, 442-43 (6th Cir. 2017) (quoting *Gordon v. Norman*, 788 F.2d 1194, 1199 (6th Cir. 1986)). All three plaintiffs have made the requisite showing to justify a punitive damages award against Cogswell. His conduct was intentional; he was convicted of criminal sexual conduct for his assault of at least one of the plaintiffs. The assaults, which are taken as established by the defendant's default, occurred in an institutional setting and were committed in a way that allowed concealment and freedom from detection. Therefore, a punitive damages award will serve an appropriate deterrent effect. The facts of the case support a punitive damages award of $250,000 for each of the plaintiffs.

### III.

The well-pleaded allegations in the amended complaint are accepted as true because of the default entered against defendant Steven Cogswell. The evidence in the record supports an award of compensatory and punitive damages for each of the plaintiffs in the amounts discussed above.

Accordingly, it is **ORDERED** that the plaintiffs' motion for a default judgement (ECF No. 104) is **GRANTED**.

It is further **ORDERED** that plaintiff Rebekah Buetenmiller shall recover from defendant Steven Cogswell compensatory damages in the amount of $550,000 and punitive damages in the amount of $250,000, for a total judgment of $800,000.

It is further **ORDERED** that plaintiff Samantha Bills shall recover from defendant Steven Cogswell compensatory damages in the amount of $550,000 and punitive damages in the amount of $250,000, for a total judgment of $800,000.

It is further **ORDERED** that plaintiff Stacey Glass shall recover from defendant Steven Cogswell compensatory damages in the amount of $550,000 and punitive damages in the amount of $250,000, for a total judgment of $800,000.

s/David M. Lawson  
DAVID M. LAWSON  
United States District Judge

Dated:   July 8, 2022